# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

## AT KNOXVILLE

## MAY 1999 SESSION

FILED

August 9, 1999

Cecil Crowson, Jr.
Appellate Court
Clerk

| | | |
|---|---|---|
| STATE OF TENNESSEE, | ) | |
| | ) | |
| Appellee, | ) | C.C.A. No. 03C01-9805-CC-00181 |
| | ) | |
| vs. | ) | Jefferson County |
| | ) | |
| JASON CROSS, | ) | Honorable Rex Henry Ogle |
| | ) | |
| Appellant. | ) | (First Degree Murder, Aggravated |
| | ) | Kidnapping) |
| | ) | |

FOR THE APPELLANT:

**EDWARD C. MILLER**
Public Defender
P.O. Box 416
Dandridge, TN 37725

FOR THE APPELLEE:

**JOHN KNOX WALKUP**
Attorney General & Reporter

**TODD R. KELLEY**
Assistant Attorney General
425 Fifth Avenue North
Nashville, TN 37243-0493

**ALFRED C. SCHMUTZER, JR.**
District Attorney General
125 Court Avenue, Suite 301-E
Sevierville, TN 37862

**JAMES L. GASS**
Assistant District Attorney General
125 Court Avenue, Suite 301-E
Sevierville, TN 37862

OPINION FILED: _____

AFFIRMED

**JAMES CURWOOD WITT, JR., JUDGE**

**OPINION**

The defendant, Jason Cross, appeals from his Jefferson County Circuit Court conviction of first degree murder and aggravated kidnapping. A jury found him guilty of one count of premeditated first degree murder of the victim, Jamie Mills, a thirteen-year-old girl, see Tenn. Code Ann. § 3913-202 (a)(1) (1997), and one count of first degree murder of the same victim committed during the perpetration of kidnapping her. See Tenn. Code Ann. § 39-13-202 (a)(2) (1997). The jury also convicted the defendant of the aggravated kidnapping of the victim. See Tenn. Code Ann. § 39-13-304 (a)(3)(1997). The trial court imposed a conviction and a life sentence on the felony murder count but entered no judgment of conviction on the premeditated murder count. It imposed a twelve-year sentence for aggravated kidnapping, to run consecutively to the life sentence. In this appeal, the defendant raises the following issues: Whether

1. The evidence was sufficient to support the convictions;

2. The trial court erred in not suppressing the defendant's confession;

3. The felony murder count should have been dismissed because aggravated kidnapping, the predicate felony for the felony murder, is not listed in the felony murder statute;

4. The trial court erred in failing to grant a judgment of acquittal as to felony murder because the kidnapping was incidental to the planned killing;

5. Defendant should have been allowed to offer expert testimony about his diminished capacity;

6. The trial court erred in allowing hearsay statements that were made by an indicted co-defendant who was not on trial;

7. The district attorney improperly argued matters outside the record; and

8. Consecutive sentences were improper.

Based upon oral arguments and this court's review of the record, the briefs, and the applicable law, we affirm the judgment of the trial court.

2

In the light most favorable to the state, the evidence showed that on the morning of June 5, 1996 the defendant borrowed Danny Guinn's green Ford Escort. At about 7:30 pm on that evening, the victim came to the home of Charlie Williams and asked to use the telephone. She stated she wanted to get a ride to New Market, but the "number" she called hung up on her. She was excited and upset and left the Williams house when she heard car tires squalling out on the road. Williams watched her walk down the road. Later that evening, the defendant drove the Ford back to the Guinn house. He had blood on his hands and a silver-colored knife in his pocket. He explained the blood by stating he had to kill a man over Guinn's "beeper." The two men, along with two women who were present at the Guinn home, went to get beer and stopped along the road, where the defendant threw the knife away.

Meanwhile, Archie Mitchell, Roger Spencer, and several other persons accompanying them entered the police station. Mitchell was upset, agitated and stated that he had witnessed the defendant stab a girl. He described the murder location at a railroad track near a "tattoo place" and said that the defendant drove away from the scene in a green Ford Escort. Officers went to the described location and found the body of Jamie Mills. She had suffered a deep stab wound in the chest.

Later, when the defendant and Guinn returned to Guinn's house in the green Ford and found police officers present, the defendant jumped from the car and ran away. Guinn informed the officers that the defendant had been in the car and had fled upon seeing the officers. Sometime later, during the early morning hours of June 6, the defendant appeared at the home of Michael Smith. The defendant had blood on him and told Smith he was running from the law. A member of Smith's family told the police that the defendant was at the Smith home, and officers arrived and arrested the defendant.

3

After the defendant was taken into custody and advised of his rights, Tennessee Bureau of Investigation Agent Steve Richardson took a written statement in which the defendant confessed to killing the victim. He stated that he, Mitchell and Spencer picked the victim up around 1:00 pm on June 5. They bought beer and spent most of the day drinking and driving around. Eventually they went to Stanley Brown's house to buy marijuana, but Brown became angry because Jamie Mills was in the car. They took her up the road and let her out. When the men returned to Brown's house, Brown told them that he would pay them "one ounce of pot to scare Jamie really bad." Brown stated that she had been "running her mouth" and giving narcotics information to the police. The defendant and his companions agreed to scare the victim.

The men picked up the victim, obtained more beer, smoked marijuana, and went to a place beside the railroad track "behind the tattoo place in Jefferson City." The men and the victim got out of the car. Mitchell asked the victim if she was wearing a wire, and she said "no." Mitchell ripped a blue star off of the victim's tee shirt. Then, Mitchell and the defendant made the victim sit down and began yelling at her about being a "snitch." Mitchell pulled the defendant aside and said they should "get rid of her." The defendant "walked over the top of her and stabbed Jamie in the chest . . . with a butcher knife. Jamie gripped her chest and yelled real loud."

Accompanied by Mitchell and Spencer, the defendant drove the green Ford to Guinn's house. In his statement, the defendant admitted to throwing the knife away. He said, "I had intentions of scaring the girl because I thought she was a snitch. I got carried away and stabbed her." After giving his statement, the defendant directed the officers to the place where they recovered the blood-smeared knife.

A pathologist testified that, although the victim suffered some

4

superficial scratches and two non-consequential knife wounds in her abdomen area, the fatal wound was a knife stab which tore through her chest, heart and lungs and stopped just before the point of the knife exited through the skin in her back. The victim died within a minute to a minute and a half after receiving this wound. The pathologist testified the wound was consistent with a wound that could be made by the knife which the defendant had thrown away.

Other forensic evidence established that the victim's blood was consistent with blood stains found on the knife and on the keys and the driver's side upholstery of the green Ford. Furthermore, a blue cloth star found in the fence row behind Guinn's house matched a tear in the victim's tee shirt.

Based upon the above evidence, the jury convicted the defendant of both premeditated and felony murder and of aggravated kidnapping. The trial court imposed a conviction of felony murder and aggravated kidnapping.

1. Sufficiency of the Evidence

In his first issue, the defendant argues that the evidence fails to support his felony murder and aggravated kidnapping convictions, as well as the jury's finding of guilt of premeditated murder. We disagree.

It is well established that a jury verdict, approved by the trial judge, accredits the testimony of the witnesses for the state and resolves all conflicts in favor of the theory of the state. State v. Hatchett, 560 S.W.2d 627, 630 (Tenn. 1978); State v. Townsend, 525 S.W.2d 842, 843 (Tenn. 1975). On appeal, the state is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 836 (Tenn. 1978).

5

Moreover, a verdict against the defendant removes the presumption of innocence and raises a presumption of guilt on appeal, State v. Grace, 493 S.W. 2d 474, 476 (Tenn. 1973); Anglin v. State, 553 S.W.2d 616, 620 (Tenn. Crim. App. 1977). The defendant has the burden of overcoming this presumption on appeal. State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977).

Most significantly, where the sufficiency of the evidence is challenged, the relevant question for an appellate court is whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 2782 (1979); Tenn R. App. P. 13. See also, State v. Williams, 657 S.W.2d 405 (Tenn. 1983). This rule applies to findings based on both direct and circumstantial evidence. State v. Thomas, 755 S.W.2d 838, 842 (Tenn. Crim. App. 1988). Circumstantial evidence alone may be sufficient to convict one of a crime. State v. Boling, 840 S.W.2d 944, 947 (Tenn. Crim. App. 1992).

In pertinent parts, the Code defines the relevant offenses as follows:

> (a) First degree murder is:
> (1) a premeditated and intentional killing of another;
> (2) a killing of another committed in the perpetration of or attempt to perpetrate any first degree murder, arson, rape, robbery, burglary, theft, kidnapping, aggravated child abuse or aircraft piracy;
> . . .
> (b) No culpable mental state is required for conviction under subdivision (a)(2) . . . except the intent to commit the enumerated offenses or acts in such subdivision[].

Tenn. Code Ann. § 39-13-202 (1997) (amended 1998).

> (a) Aggravated kidnapping is false imprisonment, as defined in § 39-13-302, committed:
> . . .
> (3) with the intent to inflict serious bodily injury on or to terrorize the victim or another. . . .

Tenn. Code Ann. § 39-13-304.

> (a) A person commits the offense of false imprisonment who knowingly
> removes or confines another unlawfully so as to interfere substantially with the other's liberty.

Tenn. Code Ann. § 39-132-302 (1997).

6

As to the felony murder and aggravated kidnapping convictions, the defendant argues there is insufficient evidence of false imprisonment. He maintains that the victim voluntarily accompanied the men and that she was stabbed immediately after she was told to sit down. However, in the light most favorable to the state, the three men took the victim to an isolated location where they intended to frighten her "really bad." They demanded to know if she was wearing a "wire," and Mitchell ripped her shirt. They "made Jamie sit down, and [they began] yelling at her and calling her a snitch." They then walked back to the car and made the victim sit down again. After a discussion between Mitchell and the defendant, the defendant fatally stabbed the victim.

This evidence supports a finding that the defendant not only knowingly removed or confined the victim unlawfully so as to substantially interfere with her liberty, but also that he intended to terrorize her during the confrontation at the railroad tracks. We believe this evidence provided the jury an ample basis for concluding that the defendant committed aggravated kidnapping *before* and while the act of homicide was contemplated and carried out. As such, the evidence supports the aggravated kidnapping and felony murder convictions.

Furthermore, the jury was justified in finding the defendant guilty of premeditated murder.

"Premeditation involves a previously formed design, or actual *intention* to kill." State v. Brown, 836 S.W.2d 530, 539 (Tenn. 1993) (quoting Lewis v. State, 40 Tenn. 127, 147-48 (1859)) (italics added in Brown). It is the process "of thinking about a proposed killing before engaging in the homicidal conduct." Id. at 541. "[N]o specific period of time need elapse between the defendant's formulation of the design to kill and the execution of that plan . . ." Id. at 543. Premeditation presents a question for the jury to decide, State v. Gentry, 881 S.W.2d 1, 3 (Tenn. Crim. App. 1993), and "the cases have long recognized that the necessary elements of first-

7

degree murder may be shown by circumstantial evidence." Brown, 836 S.W.2d at 541; see also Bullington, 532 S.W.2d 556, 560 (Tenn. 1976); State v. Carter, 970 S.W.2d 509, 516 (Tenn. Crim. App. 1997). Thus, premeditation may be inferred from the circumstances surrounding the killing. Gentry, 881 S.W.2d at 3.

The evidence shows that the defendant and Mitchell discussed the victim's fate, and the defendant had the opportunity to contemplate the killing before walking up behind a defenseless child and stabbing her with enough force that the knife all but exited through her back. Through the recording of the jury's verdict on a standard judgment form which pointedly does not impose a conviction for this offense, the trial court essentially merged the jury's verdict of premeditated first degree murder into the conviction of felony murder. State v. Fredrick Sledge, No. 02C01-9405-CR-00089, slip op. at 19 (Tenn. Crim. App., Jackson, Nov. 24, 1997) ("[A] merger of the counts amounts to nothing more than a procedural assurance that the record reflects only one judgment of conviction while also preserving the factual findings for both counts."), perm. app. granted (Tenn., Mar. 1, 1999). Had we any reason to reverse the felony murder conviction, we would be imposing the alternative conviction of premeditated first degree murder. Id.; see Tenn. Code Ann. § 40-18-111 (1997).

2. Failure to suppress the defendant's confession

The defendant assigns as error the trial court's failure to suppress the defendant's pretrial confession. The defendant moved for suppression in a pretrial motion and argued that the defendant's warrantless arrest was unsupported by probable cause and that his resulting confession was, therefore, inadmissible.

The trial court conducted a suppression hearing, at which Agent Richardson testified that Mitchell came to the police department and stated that he had seen the defendant stab a young girl at a described location behind the tattoo

8

parlor, near the railroad track. Mitchell indicated that the defendant was driving a green Ford Escort. The police found the victim's body in the condition and in the location that Mitchell reported. Independently of the murder investigation, the police had learned that the defendant was located at Michael Smith's residence. The police went to Smith's house with the owner's consent and arrested the defendant.

Additional information about the defendant's link to the murder emerged at trial. When Mitchell visited the police department to report the crime, he was upset, agitated, and was accompanied by Spencer and a number of other people. Independently of the on-going investigation on the night of June 5-6, 1996, the police knew that the defendant had been using Danny Guinn's green Ford Escort. Also, members of Guinn's household or social company had reported that the defendant had come to the Guinn house that night under suspicious circumstances. When the police arrived at Smith's house, blood was visible on the defendant's person, and he initially lied about his identity.

A trial judge's factual findings on a motion to suppress have the weight of a jury verdict and are conclusive on appeal unless the evidence preponderates against them. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996); State v. Tuttle, 914 S.W.2d 926, 931 (Tenn. Crim. App. 1995); State v. Woods, 806 S.W.2d 205, 208 (Tenn. Crim. App. 1990). In reviewing a trial court's denial of a suppression motion, this court may consider not only the evidence presented at the suppression hearing, but also the evidence presented at trial. State v. Henning, 975 S.W.2d 290 (1998).

Mitchell was agitated and upset when he came to the police department. He came with Spencer and in the company of family and friends. He imparted three vital pieces of information -- that the defendant fatally stabbed a young girl, that the killing occurred on the tracks near a certain tattoo place, and that the defendant drove away in a green Ford Escort. This information was confirmed by finding the girl in the specified location, killed by an apparent stabbing, and by police obtaining knowledge that the defendant had Guinn's green Escort on that

9

evening.

The defendant argues that, because the police knew that Mitchell and Spencer were not credible, the "veracity" element necessary to attribute probable cause to an informant's tip was not satisfied. See State v. Jacumin, 778 S.W.2d 430, 432, 436 (Tenn. 1989) (as standard for measuring probable cause, court adopted "Aguilar and Spinelli" two-prong test – "basis of knowledge" prong and "veracity" prong); State v. Pulley, 863 S.W.2d 29, 31-32 (Tenn. 1993) (Jacumin two-prong test applied to analysis of information supplied by tipster or confidential informant.) Additionally, he argues, without citation to authority, that because the *arresting* officer was not identified in the record, probable cause could not be based upon that officer's knowledge.

First, we are not persuaded by the defendant's Jacumin argument. The basis of knowledge of Mitchell, the informant, was his presence at the scene of the crime. Although the defendant does not challenge the basis of the informant's knowledge, the information of an eye-witness, reported at or near the time of the incident, lends credence to the account. Pulley, 863 S.W.2d at 32. Also, "[t]he corroboration of several of the details of the reports, such as the identity of the [perpetrator], the description of the car, and the general location of the incident, support[s] the informant's credibility." Id. In the present case, independent investigation by the police corroborated Mitchell's information about the location of the homicide, the gender and the age of the victim, the method of killing the victim, and the defendant's departure from the scene in a green Ford Escort. See State v. Simpson, 968 S.W.2d 776, 782 (Tenn. 1998) ("A showing that the informant's data is reliable may satisfy the credibility prong.") (citing State v. Ballard, 836 S.W.2d 560, 562 (Tenn. 1992)). Therefore, even if we assume there is a basis in the record for impugning Mitchell's credibility,[1] the record nevertheless supports the

---

[1]The defendant's claims of illegal arrest hinge largely upon his argument that two local officers knew that Mitchell and Spencer were not credible. We are not convinced that the defendant made a showing of this evidence. His "proffer"

10

legality of the arrest based upon the tip being the genesis of probable cause.

Furthermore, the legality of the arrest is supported by information in addition to Mitchell's tip. The defendant fled from an imminent confrontation with the police. Flight to avoid apprehension in the face of law enforcement officers has been held to be relevant because it tends to "show guilt, consciousness of guilt, or knowledge." Buckingham v. State, 540 S.W.2d 660, 665 (Tenn. Crim. App. 1976); Mitchell v. State, 3 Tenn. Crim. App. 153, 161, 458 S.W.2d 630, 633 (1970). In fact, such evidence may be considered by the trier of fact "as one of a series of circumstances from which guilt may be inferred." State v. Harris, 839 S.W.2d 54, 74 (Tenn. 1992); State v. Zagorski, 701 S.W.2d 808, 813 (Tenn. 1985).

Moreover, the officers went to the Smith residence with, at least, a reasonable suspicion the defendant committed the murder, and their encounter with the defendant further enhanced their knowledge of the defendant's culpability, *before* the arrest was effected. See Simpson, 968 S.W.2d at 780, 783. When the officers arrived, the defendant gave a false name, and the homeowner then gave the police the defendant's correct name. Also, significantly, blood was visible on the defendant's person. The arrest that was then effected was amply supported by probable cause.

Next, we agree with the defendant that, although Mr. Smith testified and described the defendant's arrest, the record does not identify the officers who came to the Smith house and made the arrest. However, this lapse in the proof is inconsequential. The lawfulness of an investigative detention or an arrest does not depend upon the detaining or arresting officers knowing the "specific facts which led

---

consisted of an unsigned "stipulation." Although the court received the stipulation which stated that the officers, were they present, would testify that Mitchell and Spencer were untruthful and unreliable, the prosecutor stated that he did not know what the officers would say if presented as witnesses, and the trial court did not indicate the weight he placed upon the "proffered" information. However, assuming that this information was before the trial court, the evidence fails to preponderate against the trial court's findings and conclusion.

their colleagues to seek their assistance." United States v. Hensley, 469 U.S. 221, 231, 105 S. Ct. 675, 681 (1985).

Moreover, we believe that the confession was admissible even if the defendant, at the time he confessed, was being held in violation of the Fourth Amendment. The confession was not "obtained by exploitation of [any] Fourth Amendment illegality." State v. Huddleston, 924 S.W.2d 666, 674 (Tenn. 1996). In Huddleston, our supreme court adopted the "fruit of the poisonous tree" analysis to determine whether a confession taken during a Fourth-Amendment-deficient custody is "'sufficiently an act of free will to purge the primary taint of the unlawful invasions.'" Id. (quoting Brown v. Illinois, 422 U.S. 590, 598, 95 S. Ct. 2254, 2259 (1975) (quoting Wong Sun v. United States, 371 U.S. 471, 486, 83 S. Ct. 407, 416 (1963)). Our supreme court utilized the following Brown v. Illinois factors in analyzing the issue: "(1) the presence or absence of Miranda warnings; (2) the temporal proximity of the arrest and the confession; (3) the presence of intervening circumstances; and finally, of particular significance, (4) the purpose and flagrancy of the official misconduct." Huddleston, 924 S.W.2d at 674-75; see Brown, 422 U.S. at 603-04, 95 S. Ct. at 2261-62.

In the present case, the defendant was twice given the Miranda warnings before he gave a statement to the police. Moreover, "temporal proximity" supports the validity of the confession. There were no "intervening circumstances," and this factor weighs in favor of the defendant. See Huddleston, 924 S.W.2d at 675. However, the purpose and lack of flagrancy of any violation weighs heavily in favor of the state. Unlike the police in Huddleston, the police in the present case had knowledge, or at least a good faith belief, that probable cause. Accordingly, three of the four factors support the trial court's denial of the suppression motion. Had there been a Fourth Amendment violation in this case, the state has carried its burden in showing that the confession would be admissible nevertheless. See Huddleston, 924 S.W.2d at 675.

12

Thus, we conclude that the defendant's confession was properly admitted into evidence.

### 3. The absence of "aggravated kidnapping" as one of the felonies enumerated in the felony murder statute

Tennessee Code Annotated section 39-13-202(a)(2), as it was worded at the time of the homicide in the present case, provided that first degree murder includes a killing of another committed in the perpetration or attempt to perpetrate "any first degree murder, arson, rape, robbery, burglary, theft, *kidnapping*, aggravated child abuse or aircraft piracy." Tenn. Code Ann. § 39-13-202(a)(2) (1997) (amended 1998) (emphasis added). The defendant urges that the felony murder count in his indictment should be dismissed because the enumeration of predicate felonies does not include *aggravated* kidnapping.

We reject this interpretation of the statute. The plain intent of the legislature in referring to various predicate felonies such as arson, robbery, burglary and kidnapping is to refer to the crime generically, and the generic reference embraces all of the particular offenses that fit within the category. For instance, the Code proscribes kidnapping, aggravated kidnapping and especially aggravated kidnapping within a chapter part entitled "Kidnapping and False Imprisonment." See Tenn. Code Ann. §§ 39-13-301, 303-05 (1997). Robbery, aggravated robbery and especially aggravated robbery are all contained within the rubric "Robbery," see Tenn. Code Ann. §§ 39-13-401--03 (1997), and the same arrangement exists for the various grades of "arson" and "burglary." See Tenn. Code Ann. §§ 39-14-301--02; §§ 39-14-401--04 (1997). It would be absurd to suppose that the legislature intended that only the least grades of these various offenses could serve as predicates for felony murder convictions. The legislature specified particular offenses only when it wished to utilize a higher grade of a given offense as a predicate felony; hence, to serve as a predicate felony, murder must be first degree murder and child abuse must be aggravated. Tenn. Code Ann. § 39-13-202(a)(2)

13

(1997) (amended 1998). Otherwise, with respect to kidnapping, the offense now before us, felony murder is indicated by the perpetration or attempt to perpetrate "*any* . . . kidnapping," including aggravated kidnapping. Tenn. Code Ann. § 39-13-202(a)(2) (1997) (emphasis added).

### 4. Invalidity of felony murder conviction based upon the incidental relationship of the kidnapping to the homicide

In his next issue, the defendant argues that the trial court should have granted his motion for acquittal on the felony murder count because the aggravated kidnapping, as the predicate felony, was merely incidental to the homicide. Relying upon State v Anthony, 817 S.W.2d 299 (Tenn. 1991), the defendant argues that, not only was the kidnapping incidental to the murder, but the kidnapping could not increase the risk of harm to the victim because the resulting crime was murder.

In Anthony, the supreme court established the guidelines for determining whether a defendant may be convicted of kidnapping and another felony based upon a single criminal episode. Anthony was a consolidation of two cases, and in both, the defendants robbed business establishments. Both defendants forcibly confined employees of the businesses they robbed by requiring them to remain in the same location or to move to a different location within the business establishments. Both defendants were convicted of robbery and kidnapping offenses.

In determining whether separate convictions were proper, the supreme court looked to "whether the confinement, movement, or detention is essentially incidental to the accompanying felony and is not, therefore, sufficient to support a separate conviction for kidnapping, or whether it is significant enough, in and of itself, to warrant independent prosecution and is, therefore, sufficient to support such a conviction." Anthony, 817 S.W.2d at 306.

14

More recently, in State v. Dixon, 957 S.W.2d 532, 534 (Tenn. 1997), the supreme court stated that, in determining whether separate convictions may stand, the trial court must first consider "whether the movement or confinement was beyond that necessary to consummate the [sexual offense]." Dixon, 957 S.W.2d at 535. In this regard, "it is the purpose of the removal or confinement and not the distance or duration that supplies a necessary element of aggravated kidnapping." Dixon, 957 S.W.2d at 535. If the additional movement or confinement was beyond that necessary to consummate the offense, the court must then inquire whether that "additional movement or confinement: (1) prevented the victim from summoning help; (2) lessened the defendant's risk of detection; or (3) created a significant danger or increased the victim's risk of harm." Dixon, 957 S.W.2d at 535.

As charged in the indictment, especially aggravated kidnapping is false imprisonment for the purpose of terrorizing the victim or another. See Tenn. Code Ann. § 39-13-304(a)(3) (1997). False imprisonment is the knowing removal or confinement of another "unlawfully so as to interfere substantially with the other's liberty." Tenn. Code Ann. § 39-13-302(a) (1997).

The defendant emphasizes the fact that the victim voluntarily left and rode around with the defendant and his companions and was then confined only to the extent necessary to kill her. Therefore, he posits separate convictions cannot stand. On another level, the defendant seems to be suggesting that we should extrapolate from Anthony a determination that a felony murder conviction is impermissible when the predicate felony is incidental to the homicide.

We disagree that Anthony bars separate convictions on the facts of this case. The defendant and his companions decided to terrorize the victim, and after they took her to a remote location, they proceeded to do just that, by yelling and screaming at her and accusing her of "snitching." She was detained, or confined, by being forced to sit down twice in the presence of three men who were

15

verbally abusing, if not threatening her. Based upon the defendant's confession, aggravated kidnapping had already occurred and was ongoing when the defendant first decided to kill the victim. This is not a case where the movement of the victim to a more remote location was accomplished in order for the accused to carry out his ultimate criminal intent. Rather, the record supports a finding that in this case the kidnapping occurred prior to formation of the intent to commit the ultimate crime of murder.

Thus, the evidence clearly demonstrates that the removal and confinement were not incidental to the homicide; rather the defendant's actions were the proper basis for separate convictions of aggravated kidnapping and murder. See Dixon, 957 S.W.2d at 533 (separate convictions of aggravated kidnapping, aggravated assault and attempted sexual battery were upheld where the defendant assaulted the victim on sidewalk then dragged her behind bushes in vacant lot and attempted sexual assault). Neither the first degree murder nor the aggravated kidnapping conviction need be abated. Given our view of the evidence, we need not fathom any extrapolated argument that a felony murder conviction is not permissible when its predicate felony is incidental to the homicide.

5. Trial court's disallowance of testimony from the defendant's
expert witness on the issue of the defendant's diminished capacity

At a pretrial hearing, the defendant and the state argued the admissibility of testimony of Dr. Eric Engum, an expert witness the defendant proposed to call in order to establish his "diminished capacity" to form criminal intent. The trial court agreed with the state that the defendant could not use the expert witness to show that the defendant had "diminished capacity because of personality disorders or things like this," and the trial court limited the expert's testimony to an opinion about the influence of any alcohol or drugs which the defendant may have used prior to the homicide.

16

Doctor Engum is a clinical neuropsychologist and forensic psychologist. The defendant made no live-witness proffer of the proposed evidence, but he did offer, and the court received, Dr. Engum's thorough, written report, which was based upon a psychological screening interview and an extensive battery of tests. It revealed the sad history of a young man, a tenth-grade drop-out, whose childhood was marred by sexual abuse at the hands of his older brother, chronic academic failure, negligible parenting, chemical abuse, and repeated placements in juvenile institutions. At the age of twenty-three at the time of sentencing, his brief adulthood had been marred by drug and alcohol abuse, employment and marital failures, and numerous burglary, theft and vandalism convictions. Dr. Engum opined that the defendant demonstrated the following characteristics: (1) attention deficit disorder, (2) performance in the "dull normal range of intellectual functioning, . . . consistent with his prior educational and vocational background" (Full Scale IQ of 86, Performance IQ of 90) ( "clear, logical" thought processes, but with "some deficits in basic cognitive organization" and a concrete, inflexible "reasoning process," although performance was above average when given a "language free measure[ment] of cognitive ability"), (3) a psychological dependence on marijuana and a psychological and physiological dependence on alcohol and history of abuse of hallucinogens, sedative, hypnotic and anxiolytic drugs, (4) a learning disability in the areas of reading and mathematics and a tested Grade Equivalent of 6.1, (5) a "depressive disorder not otherwise specified," and (6) a mixed personality disorder with avoidant and schizoid features. The defendant reported to Dr. Engum that, on the day of the killing, he had used marijuana, LSD, and alcohol. With respect to "any mental disease or defect which might relate to [the defendant's] state-of-mind at the time of the commission of the offense," Dr. Engum opined only that "the evidence does suggest that Mr. Cross was under-the-influence [sic] of significant amounts of alcohol as well as . . . [LSD]."

The defendant alleges that the trial court erred in denying the defendant the opportunity to prove his "diminished capacity" to intend to kill and

kidnap.

"Diminished capacity" is not a defense in Tennessee. State v. Phipps, 883 S.W.2d 138, 149 (Tenn. 1994). Our supreme court has discouraged the use of the phrase "diminished capacity" because it poorly reflects the proper use of the evidence to "negate the existence of the culpable mental state required to establish the criminal offense." State v. Hall, 958 S.W.2d 679. 690 (Tenn. 1997), cert. denied, --- U.S. --- 118 S. Ct. 2348 (1998).

When a defendant uses *expert* testimony to prove he or she lacked the capacity to intend the crime, "the psychiatric testimony must demonstrate that the defendant's inability to form the requisite culpable mental state was the product of a *mental disease or defect*, not just a particular emotional state or mental condition." Hall, 958 S.W.2d at 690 (emphasis added). In Hall, the defendant asserted trial court error in disallowing his psychiatric expert to testify about his "diminished capacity" to intend murder. The defense wanted to prove that Hall's consumption of alcohol "would have had [an affect] on him with his type of personality" and that he was under "emotional distress and stress." Id. At the sentencing hearing, the expert testified Hall had "a borderline personality disorder and that such people could have brief episodes of rage during 'temporary states of mental illness.'" Id. at 691. Our supreme court rejected Hall's claim and held that "[t]hough expert testimony is admissible to show that because of mental disease or defect, a defendant lacked the capacity to form the mental state required to constitute the offense. . . , the testimony in this case did not meet that standard." Id. at 692.

The evidence proposed by Hall failed in three respects. First, the expert did not propose to testify that Hall "lacked the capacity to premeditate and deliberate the killing because of a mental disease or defect." Id. at 691. Second, the expert spoke only abstractly and generally about typical persons with personality

18

types similar to Hall's type, instead of discussing "the capacity of the particular defendant on trial." Id. Third, the "personality type and character traits which [the expert] gleaned from the test results and a single three hour interview" do not equate to proof of "a defendant's *capacity* to form the mental intent." Id. (italics in original).

Initially, we note that a trial court's rulings on the admissibility of evidence are reviewed on appeal under an abuse-of-discretion standard. State v. Griffis, 964 S.W.2d 577, 594 (Tenn. Crim. App. 1997), perm. app. denied (Tenn. 1997).

The trial court did not specify the evidentiary basis for its ruling which limited the proposed expert testimony to showing the effects of voluntary intoxication on the defendant's culpability. However, the ruling was implicitly based upon either Tennessee Evidence Rule 402 or 702, or both. Rule 402 requires that evidence be relevant as a condition to its admissibility. Rule 702 deals specifically with expert testimony. If the testimony is based upon scientific, technical or specialized-knowledge information, the expert witness may testify if his or her knowledge or opinion "will substantially assist the trier of fact to understand the evidence or to determine a fact in issue." Tenn. R. Evid. 702.

After a review of Dr. Engum's report, we conclude that the trial court properly limited the scope of the proposed expert testimony, based upon either evidence rule. First, the report does not clearly indicate whether the defendant was hampered by any "mental disease or defect." Certainly, the defendant has limitations and problems, including diagnosed personality disorders; however, he is neither psychotic, mentally retarded, nor suffering from debilitating brain injury. Given the Hall requirement that expert testimony of this type be grounded upon mental disease or defect, the proffer fails to show that the evidence is relevant. See Tenn. R. Evid. 402.

19

Secondly, and in this case more importantly, the Engum report set forth no opinion that the defendant lacked the legal culpability to commit the offense on trial, except for the opinion that his criminal intent was influenced by the use of drugs and alcohol. The report is devoid of any evidence that any other condition -- be it his chemical dependency, personality disorder, learning disability, or anything else -- resulted in the defendant's incapacity to form the requisite intent to commit the offenses. As such, the expert evidence as depicted in the report was not of substantial assistance to the jury. See Tenn. R. Evid. 702. The trial court was correct in isolating the defendant's pre-crime drug and alcohol use as the sole factors which may have influenced his capacity to fulfill the mental elements of murder and kidnapping.

### 6. Admission of out-of-court statements of indicted co-defendant who was not on trial

In his next issue, the defendant complains of the testimony of a state witness that Archie Mitchell came into the jail on the night of the killing and reported that "he'd witnessed a homicide, seen this little girl get killed." The defendant objected to the testimony, and following a bench conference, the trial court sustained the objection and cautioned the jury that it could not use such testimony as indicating the truth of the matter asserted by the out-of-court declarant, but only as a basis of understanding why an investigation was commenced.

The statement was hearsay. See Tenn. R. Evid. 801(c), 802; State v. James Roy Jernigan, No. 01C01-9709-CC-00414, slip op. at 7 (Tenn. Crim. App., Nashville, Sept. 29, 1998). The state advances no hearsay rule exception that would authorize the use of the statement. Moreover, the criminally accused has the right to confront those who testify against him. U.S. Const. amend. VI; Tenn. Const. art. 1, § 9. Admission of an incriminating statement of a non-testifying co-defendant violates a defendant's constitutional right of confrontation. Bruton v. United States, 391 U.S. 123, 126, 88 S. Ct. 1620, 1622 (1968); Smart v. State, 544 S.W.2d 109,

20

112 (Tenn. 1976). Although in this case the defendants were not tried jointly, the statements of a non-testifying co-defendant would generally be inadmissible both on constitutional and hearsay grounds. See James Ray Jernigan, slip op. at 8.

In the present case, however, any error in allowing the statement was undoubtedly harmless beyond a reasonable doubt. See Tenn. R. Crim. P. 52(a); Tenn. R. App. P. 36(b); Chapman v. California, 386 U.S. 18, 24, 87 S. Ct. 824, 828 (1967). The comment itself was brief and innocuous. The trial court gave the jury an immediate remedial instruction. Finally, the evidence of the defendant's guilt was overwhelming.

### 7. State's closing argument

In this issue, the defendant argues that the following closing-argument statement of the prosecutor was improper and prejudicial:

> If it wasn't for the fact that this man right here was confronted with the fact that his two other friends had already gone to the police and told them what happened, and he was confronted with that, he had no choice.

The defendant objected that his argument was outside the record.

The review of this issue first entails a determination of whether prosecutorial misconduct occurred. State v. Pulliam, 950 S.W.2d 360, 367 (Tenn. Crim. App. 1996), perm. app. denied (Tenn. 1997). That determination initially requires a decision about whether the challenged conduct is improper. Id. Although trial courts have discretionary authority to control the argument of counsel and counsel has wide latitude to argue the facts and reasonable inferences therefrom, "[c]losing arguments must be temperate, must be based upon evidence introduced at trial, and must be relevant to the issues at trial." State v. Coker, 911 S.W.2d 357, 368 (Tenn. Crim. App. 1995). Most of the restrictions fall upon the prosecutor, who is the representative of the state and whose duty it is not only to seek convictions but also to achieve justice through proceeding fairly. Id.; Manning v. State, 195

21

Tenn. 94, 257 S.W.2d 6 (Tenn. 1953). The prosecutor's argument should not be calculated to inflame the jury. Coker, 911 S.W.2d at 368.

Once prosecutorial conduct is deemed improper, the appellate court's task is to determine "whether the impropriety affected the verdict." Pulliam, 950 S.W.2d at 367. Prejudice is assessed through analyzing the misconduct in light of the factors set forth in Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976): (1) the misconduct viewed in context and the facts and circumstances of the case; (2) any curative measures taken by the court or the prosecutor; (3) the intent of the prosecutor; (4) the cumulative effect of the misconduct in view of the consequence of any other errors in the trial; and (5) the "relative strength or weakness of the case." Judge, 539 S.W.2d at 344.

Assuming that the cited argument was not based upon the evidence, our analysis of the Judge factors results in our finding that no prejudicial error occurred. Two factors weigh against the state. First, the prosecutor's remark was not supported by the evidence. Second, the trial court overruled the defense objection and took no curative action. However, the other three factors weigh heavily against the defendant. The remark was brief. Although no trial is perfect, this transcript contains few potentially prejudicial errors. Finally, the case against the defendant is very strong. Physical evidence implicated him, and his confession was palpable and cogent. Against convicting evidence of such magnitude, the prosecutor's remark is inconsequential.

8. Consecutive sentencing

In his last issue, the defendant complains about the imposition of consecutive sentences.

When there is a challenge to the length, range, or manner of service

22

of a sentence, it is the duty of this court to conduct a *de novo* review of the record with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. §40-35-401(d) (1997). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). "The burden of showing that the sentence is improper is upon the appellant." Id. In the event the record fails to demonstrate the required consideration by the trial court, review of the sentence is purely *de novo.* Id. If appellate review reflects the trial court properly considered all relevant factors and its findings of fact are adequately supported by the record, this court must affirm the sentence, "even if we would have preferred a different result." State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

In making its sentencing determination, the trial court, at the "conclusion of the sentencing hearing," determines the range of sentence and then determines the specific sentence and the propriety of sentencing alternatives by considering (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the enhancement and mitigating factors; (6) any statements the defendant wishes to make in the defendant's behalf about sentencing; and (7) the potential for rehabilitation or treatment. Tenn. Code Ann. § 40-35-210(a), (b) (1997); Tenn. Code Ann. § 40-35-103(5)(1990); State v. Holland, 860 S.W.2d 53, 60 (Tenn. Crim. App. 1993).

Prior to the enactment of the Criminal Sentencing Reform Act of 1989, the limited classifications for the imposition of consecutive sentences was set out in Gray v. State, 538 S.W.2d 391, 393 (Tenn. 1976). In that case our supreme court ruled that aggravating circumstances must be present before placement in any one of the classifications. Later, in State v. Taylor, 739 S.W.2d 227 (Tenn. 1989),

23

the court established an additional category for those defendants convicted of two or more statutory offenses involving sexual abuse of minors. There were, however, additional words of caution: "[C]onsecutive sentences should not routinely be imposed ... and ... the aggregate maximum of consecutive terms must be reasonably related to the severity of the offenses involved." Taylor, 739 S.W.2d at 230. The Sentencing Commission Comments adopted the cautionary language. Tenn. Code Ann. § 40-35-115. The 1989 Act is, in essence, the codification of the holdings in Gray and Taylor. Consecutive sentences may be imposed in the discretion of the trial court only upon a determination that one or more of the following criteria[2] exist:

(1) The defendant is a professional criminal who has knowingly devoted himself to criminal acts as a major source of livelihood.

(2) The defendant is an offender whose record of criminal activity is extensive;

(3) The defendant is a dangerous and mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;

(4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;

(5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;

(6) The defendant is sentenced for an offense committed while on probation;

(7) The defendant is sentenced for criminal contempt.

Tennessee Code Ann. § 40-35-115(b) (1990). In State v. Wilkerson, 905 S.W.2d 933, 937-38 (Tenn. 1995), the supreme court imposed two additional requirements for consecutive sentencing -- the court must find consecutive sentences are

_____

[2]The first four criteria are found in Gray. A fifth category in Gray, based on a specific number of prior felony convictions, may enhance the sentence range but is no longer a listed criterion. See Tenn. Code Ann. § 40-35-115, Sentencing Commission Comments.

reasonably related to the severity of the offenses committed and are necessary to protect the public from further criminal conduct. At this time, it is unsettled whether <u>Wilkerson</u> applies to all seven of the statutory categories for consecutive sentencing or only the "dangerous offender" category. <u>See</u> <u>State v. David Keith Lane</u>, No. 03C01-9607-CC-00259, slip op. at 11 (Tenn. Crim. App., Knoxville, June 18, 1997), <u>perm</u>. <u>app</u>. <u>granted</u> (Tenn. 1998).

The trial court imposed consecutive sentences based upon the defendant being on probation when the present offenses were committed. <u>See</u> Tenn. Code Ann. § 40-35-115(b)(6) (1997). However, the state concedes that the defendant had been serving a community corrections sentence, as opposed to being placed on "probation," and that our supreme court's decision in <u>State v. Pettus</u>, 986 S.W.2d 540 (Tenn. 1999), precludes the use of factor (6) of section 40-35-115(b) to impose consecutive sentences. We agree. In <u>Pettus</u>, the high court held that "a community corrections sentence is not equivalent to probation" and will not support consecutive sentencing based upon factor (6). <u>Pettus</u>, 986 S.W.2d at 54, slip op. at 1.

Having concluded that the trial court selected an improper basis for imposing consecutive sentences and having before us a complete trial and sentencing record, we will now determine *de novo* whether the sentences should be imposed to run concurrently or consecutively.

The presentence report reflects that, while a juvenile, the defendant was adjudicated guilty of four counts of theft, three counts of burglary, and three counts of vandalism. The defendant, who was twenty-two years of age when he killed Jamie Mills and twenty-three when he was sentenced, had been convicted as an adult of one count of vandalism, five thefts, and seven burglaries. Consequently, the defendant is "an offender whose record of criminal activity is extensive." Tenn. Code Ann. § 40-35-115(b)(2) (1997). Moreover, we find that the extended

25

incarceration resulting from consecutive sentences is appropriate to the offenses and is necessary to protect the public.  For these reasons, the sentences imposed by the trial court shall be served consecutively.

For the reasons explained above, the trial court's judgment is affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE

CONCUR:

_____
JOHN EVERETT WILLIAMS, JUDGE

_____
ALAN E. GLENN, JUDGE